### In re WALTHER'S WILL.

(*Surrogate's Court, New York County.*   September 9, 1889.)

WILLS—MENTAL CAPACITY—EVIDENCE.

On petition to revoke the probate of a will, petitioner's evidence showed that decedent signed the instrument; declared, on its being read to her, that it was her will; and requested her brother and brother-in-law to become witnesses. The will was executed while decedent was suffering from a painful malady, which in a few hours caused her death, but was signed plainly and legibly. Decedent prefixed "Mrs." to her name, which appeared to be an unusual thing for her to do. Her husband was made sole legatee. It appeared that decedent had, during the night before, several times expressed an opinion that she was about to die, and desired to make her will, and gave directions as to her funeral, etc. She knew the draughtsman of the will when he came into her room, told him that she wanted to leave everything to her husband; and said, "Yes," on his reading it to her, and asking if it was right. Witnesses testified that, on being told not to forget her child, decedent said that she wanted her husband, with whom she lived on affectionate terms, to have everything, and that he would care for the child. On signing the paper, she asked that the blinds be raised so that she could see where she was writing. She said that she wanted to have matters "in black and white," so that there would be no trouble when she was gone. *Held*, that decedent was mentally competent.

On petition to revoke probate of the will of Henrietta Walther, deceased.

*Booraem, Hamilton & Brackett*, for petitioner.   *Henry F. Lippold,* for executor.

RANSOM, S.   The will of the decedent was executed on the 5th day of February, 1888. A petition for its probate was filed by her husband, William Walther, who is the executor and the sole legatee. Late in April, 1888, the subscribing witnesses, Charles Riederer, the husband of a sister of the decedent, and Charles Regnault, the decedent's brother, appeared before the probate clerk of this court, and made formal depositions showing the due execution of the will, on which the paper was admitted to probate. On the 1st day of February, 1889, the special guardian of the infant son of the decedent filed a petition for the revocation of probate, alleging the mental incompetency of the decedent, that the paper was not executed according to law, and that its alleged execution was procured by fraud and coercion. The contestant offered no proof to sustain the last allegation. Eight days previous to the preparation and execution of the instrument, the decedent was taken ill with pneumonia. She grew worse. Early in the morning of February 5th her husband notified decedent's brothers, who reside a few blocks away, of her impending death. Later, about 8 o'clock, Mr. Lippold, an attorney, was summoned, and the paper in question was drawn and executed. About 2 o'clock in the afternoon the decedent died.

The sole question to be considered is the decedent's mental competency when she signed the will. I shall first consider the testimony of the witnesses for the petitioner, and among them I must include that of her brother Charles Regnault, one of the subscribing witnesses, who manifestly favors the revocation of probate. He arrived with his wife at the apartments of the decedent between 6 and 7 o'clock in the morning, and found her very ill, with the physician at her bedside. After the physician left, Mr. Regnault went into the decedent's bedroom, and told her that he hoped that she would be better, but she made no reply. Subsequently, Mr. Lippold came in, and said to the decedent: "Good morning, Mrs. Walther. I am sorry to see this." Then Mrs. Riederer and Mr. Riederer told Mr. Lippold that they wanted him to draw a will leaving her property to her husband, and Mr. Regnault states that Mr. Lippold had no further conversation that he heard. Lippold went into the dining-room, between which and the bedroom were open folding doors, drew the will, returned to the bedroom, read the paper to the decedent, and asked her whether it was her last will and testament, and whether it was right, and, getting no answer, he repeated the question, and the decedent

faintly said, "Yes." Lippold then asked her who it was that she wished as witnesses to her will, and decedent looked up, and answered in a very low tone, "My brother Charlie." He then asked her who was to be the other witness, and she looked and said, "My brother-in-law Riederer." The decedent was then lifted in bed, pillows were placed behind her, a book was laid on her lap, and a pen given her; but, before she signed, her brother Philip Regnault called her attention to the fact that she was making no provision for her son, to which the witness states she made no reply. He then whispered to Philip not to interfere. The decedent signed the will, after which Mr. Regnault says Lippold asked Mr. Riederer and himself, in the presence of the decedent, to sign as witnesses, and they did so on the foot of the bed. Mr. Lippold then asked the decedent what she wanted to do with the will, and he repeated the question, and said, "Shall I put it in my safe?" and the decedent nodded. Lippold took the paper, and left the apartments a few minutes after, being accompanied by the two brothers Regnault and the proponent, Mr. Walther.

Miss Miller, a trained nurse from the German Hospital, who had charge of the decedent during the days of her sickness, arrived on Sunday morning about 8 o'clock, relieving the night nurse. She testifies that the decedent signed the will after it was read aloud to her by Mr. Lippold, but that she did not hear her utter a word from 8 o'clock until she died, and she did not hear anything Mr. Lippold said, nor did she see either of the witnesses sign, she being engrossed in her duties with the patient. But, on further questioning, she recollected that Philip Regnault interfered, stating that the decedent should think of her child, and that decedent said she wanted to give her property to her husband, and Mr. Walther said he would take care of the child. At first she thought that this occurrence took place on the evening before, but she coupled the statement of the decedent that she desired the property to go to her husband with Philip's interference. As it is not claimed that Philip's remark occurred at any time except at the execution of the will, it is manifest that the two events took place that morning, as testified to by other witnesses.

Mrs. Regnault, the wife of the subscribing witness, states that after the doctor had left the apartment, a little after 7 o'clock on the morning of her visit, she went into decedent's room, and told her that she felt sorry that she was so sick, and hoped that she would be all right again; and decedent then said, in a very weak tone of voice, that she wished it was all over. She heard Mrs. Riederer say something about the will when near the decedent, and that she wanted it in black and white; but she did not hear decedent say anything other than the statement that she wished it was over. When Mr. Lippold came, he said: "Good morning, Mrs. Walther. I am sorry to see this." Then Mrs. Riederer told him that the decedent wanted to make a will, and Mr. Lippold sat down in the dining-room and wrote it; and when it was completed he took it to the decedent's bedside, and said: "I am pretty sure you will get through this. This is a matter of form;" and either before or after the remark—the witness does not state definitely which—he asked her if she acknowledged the paper to be her last will and testament, and she answered, "Yes." Then her brother Philip Regnault came forward, and said: "Here's where I come in. Hattie, are you not going to think of your child?" Decedent looked at him, but made no answer. A book was then put before her; a pen was dipped for her, and she wrote; and the pen was again dipped, and she, with apparent difficulty, appended her signature. Mr. Lippold then asked the decedent who she wished to be her witnesses, and the decedent then replied, in a very faint tone of voice, "My brother Charlie and my brother-in-law Riederer." Then Mr. Riederer and her brother signed the paper as witnesses. Mrs. Regnault further states that, after Mr. Lippold left, the decedent did not speak unless spoken to, and she answered, "Yes," and her voice

was very low and weak. She remained until about 12 o'clock, and did not hear the decedent say anything more about the will.

Philip Regnault testifies that, when Mr. Lippold came into the room in the morning, he said, generally, "Good morning;" and then Mr. and Mrs. Riederer told Lippold that the decedent wanted to draw up a will leaving everything to her husband. Mr. Lippold went to the foot of the bed, and said, "Good morning, Mrs. Walther," and then seated himself at the table in the dining-room, wrote the will, came back to the foot of the bed, and read it to the decedent, and, after reading it, asked her whether she declared it to be her last will and testament. There being some hesitation in replying, he again put the question to her, and she answered, faintly, "Yes." The witness states that he then stepped to the foot of the bed, and told the decedent that there was nothing in the will providing for her boy, and that she made no reply. His brother Charles pushed him aside, and said that that was not the proper time to interfere. Then Mr. Lippold asked the decedent whom she wanted for witnesses, and, getting no reply, he asked her again, and the decedent pointed to Charles Regnault and Mr. Riederer. Further on in his testimony, he intimates that she mentioned their names. The decedent then signed the paper with difficulty, the pen being dipped twice in the ink for her, and then the subscribing witnesses signed. Mr. Lippold asked the decedent if she would keep the paper, or if he should put it in his safe. Witness did not hear her make any reply, and Lippold put it in his pocket, bade the decedent good-bye, and left with the others. The witness returned in 20 minutes or half an hour, and he did not hear the decedent say anything after his return, though she might have spoken in such a low tone of voice that he could not have heard it in the dining-room.

The petitioner's proofs clearly show a signing of the instrument, a declaration by her that it was her will, and a request that the subscribing witnesses attest its execution by their signatures. As the paper was read to her, she must, if conscious, have known its directions in respect to the disposition of her estate. That she signed it in plain, legible, and strongly written hand, in view of her weakened condition from a distressing malady that in a few hours caused her death, is manifest by an inspection; and that the signing was not a merely mechanical act, without consciousness of what she was do-ing, (as often happens in the routine of business, where persons sign their names many times during a day,) is apparent from the fact that she did not simply write her name, but prefixed the abbreviation "Mrs." showing a knowl-edge of her relation to the legatee. And, as the witnesses say this was an un-usual thing for her to do, it is an evidence of thought on her part which ac-companied the signing, and is conclusive, to my mind, that she was conscious of the nature of her act, and, with the other proofs, that the paper was a re-flection of her testamentary wishes. But, if any doubt be claimed to exist in respect to her knowledge of the contents of the will, and of the successive steps taken in its preparation and execution, it is removed by the respondent's proofs.

Mrs. Riederer states that she was with the decedent at 2 o'clock on Sunday morning, and heard her state to her husband, Mr. Riederer, that she was go-ing to die, and she told her that she wanted to make her will, and that her brother, Mr. Charles Regnault, should be called. About that time she told Mrs. Riederer, in the presence of the night nurse, Mrs. Brueggen, that Mrs. Riederer's daughter should have her piano and her wedding dress, Mrs. Brueg-gen her black cashmere dress, and Mrs. Riederer her diamond ear-rings; and she stated the kind of dress she wanted her body in, how long she wished to be on ice, and that Mrs. Riederer should see that she had a very nice funeral. At 4 o'clock she said to them that she was going to die; that her heart was broken that she must leave her little boy. At 5 o'clock, Mrs. Riederer's children were taken to the bedside, and she spoke to each of them, and bade

them good-bye. When her own child was brought to her, she did not say good-bye to him. She said she knew she was very young, and she would like to live; that when she should die, Mrs. Brueggen (who had attended her as nurse, on the birth of her children) should take care of Mrs. Riederer when sick. When, between 5 and 6 o'clock, Charles Regnault arrived, the decedent told him that she was going to die, and, upon his seeming to make light of her apprehensions, she said again that she would die, and that she wanted to make her will. When Mr. Lippold arrived, he asked the decedent if she knew him, and she said: "Yes; you are Mr. Lippold." When asked whether she wanted her will made, she told Mr. Lippold that she wanted to leave everything to her husband; and when the will was read he asked the decedent if it was right, and she said, "Yes." She further testifies that, when Philip Regnault asked the decedent not to forget that she had a child, the decedent said, in a decided tone of voice, that she wanted everything that she had to go to her husband. Then Lippold asked who she wanted to act as witnesses, and she said her brother Charles and Mr. Riederer. During the morning she said to her brother Charles that her father was buried nine years before on the same day, and that this was the last day she should be here. About 12 o'clock, on learning that the girl intended to make a fire in the front room, the decedent told her not to light it, as she would not live until that evening. Five minutes before she died, Mrs. Riederer was called up, and she asked the decedent how she felt, and she replied that she was in great pain.

Mr. Riederer testifies that when he arrived, between 5 and 6 o'clock in the morning, he asked decedent how she felt, and whether she was any worse; and she replied: "I am going to die." He suggested that her case was not so bad; and she said there was no doubt she was going to die, and wanted to make her will,—wanted to have everything in black and white. He asked how she intended to make it, and she said she was going to leave everything to her husband. When asked if she did not wish to leave anything to the child, she said no; that her husband would take care of him. She also said to Riederer that the paper was going into court; and to avoid any trouble in the family with her husband, and that he should get the money, she was going to have it in black and white before she died. He further states that no one in his presence, except the decedent, made any suggestions as to what should be in the will. She spoke of suffering great pain, and asked the physician when he came for something to stop it. He also testifies to the fact of decedent's bidding good-bye to his children, and shaking hands with her boy, but not saying anything to him, apparently because her feelings were overcome. Lippold asked the decedent in whose favor the will should be made, and she replied that everything should be for her husband; and after the will was written, and was read by Mr. Lippold to the decedent, in response to a question she expressed her satisfaction with its contents. When she was about to sign, she requested Mr. Riederer to raise the blinds so that she could see where she was writing, and she began writing her name, and as there was not enough ink in the pen she took more, and finished the signature. This fact is apparent from an inspection of the paper, for the last name is in heavier lines. About 12 o'clock in the day the decedent again complained of suffering great pain, and asked the physician to give her something to relieve her, saying that she could not stand it any longer, and wanted to die. A few minutes before her death, at 2 o'clock, Mr. Riederer asked her if she had the pains yet, and she replied it was worse and worse, and she could hardly stand it.

Mrs. Brueggen, the night nurse, left at 8 o'clock in the morning, as Mr. Lippold arrived at the house. At 12 o'clock the preceding night, decedent asked her to close the doors between the bedroom and the dining-room, where her husband was lying on the lounge, stating that she had something to say. She then told Mrs. Brueggen that she had had a dream, and had seen her father and mother, and she knew that she was going to die. Mrs. Brueggen expressed a

doubt, but she reasserted her belief, and stated that she wanted to have her will made, and then suggested the same disposition in respect to the piano, her dresses, and her diamond ear-rings as stated by Mrs. Riederer in her testimony, and said all the rest of her property should go to her husband. Mrs. Brueggen told her that she should not forget her child, and decedent said that, if the child should live, her husband would take care of him. When Mrs. Riederer came into the room, at 2 o'clock, Mrs. Brueggen says that the decedent again stated that she was going to die, and that she wanted to have matters in black and white on paper, so that there should be no trouble when she was gone.

The testimony of Mr. Lippold, the attorney, has not been considered by me. No doubt, in some particulars, it is competent, but the due execution of the will is established by other testimony.

Nothing is disclosed in the record of proofs to lead me to doubt that the decedent, at the time she executed the will, fully understood the nature of her estate, the claims upon her of her child and her husband, and that her expressed wish that her property should go to her husband, (with whom the testimony shows she lived on terms of affection,) in full faith that he would take care of the child, was in accordance with an intelligent and well-considered purpose; for it appears by the testimony of Mrs. Riederer that, a fortnight before her death, the decedent stated to her that as soon as she got the money that belonged to her from her mother's estate she should draw a will leaving everything to her husband. Whether the disinheritance of her child, and the trust she reposed in her husband, was wise, or warranted by prudent foresight, it is not for me to say. Holding, as I do, that she possessed, at the time, mental competency, and was not under restraint, she had a right do as she pleased with her own. A decree denying the petition for the revocation of probate may be submitted.